United States District Court
District Court of Maine

GLEN PLOURDE,                                    )
                                                 )
                    Plaintiff                    )
                                                 )
        v.                                       )          **Amended Complaint**
                                                 )          **1:19-cv-0486-JAW**
UNKNOWN MAINE STATE POLICE                       )
OFFICER #1 and UNKNOWN MAINE                     )          **Judge Woodcock**
STATE POLICE OFFICER #2,                         )
                                                 )
                    Defendants                   )

### Amended Complaint

### I. Parties to the Complaint

Plaintiff

1.  Glen Plourde
    7 Hussey Road Apt 3
    Albion, Kennebec County
    Maine 04910
    207.659.2595
    Glen.Plourde@Gmail.com

Defendant #1

2.  Unknown Maine State Police Officer #1
    Maine State Police Officer (Rank Unknown)
    42 State House Station (MSP Headquarters)
    45 Commerce Drive
    Augusta, Kennebec County
    Maine 04333-0042
    207.624.7200
    Email Unknown

Defendant #2

3.  Unknown Maine State Police Officer #2
    Maine State Police Officer (Rank Unknown)
    42 State House Station (MSP Headquarters)
    45 Commerce Drive
    Augusta, Kennebec County

- 1 -

Maine 04333-0042
207.624.7200
Email Unknown

## II.  Jurisdiction and Venue

4. This Court has subject matter jurisdiction over Plaintiff's Federal
   Constitutional Claims pursuant to 28 U.S.C. §§ 1331 and 1343, and 42
   U.S.C. §§ 1983 and 1988, as this action arises under the Constitution and
   laws of the United States.

5. This Court has subject matter jurisdiction over Plaintiffs' Maine State
   Constitutional Claims pursuant to 28 U.S.C. § 1367, as those claims
   are substantially related, both legally and factually, to the Federal
   Constitutional Claims upon which original jurisdiction is premised.

6. This Court has personal jurisdiction over the Defendants as they are all
   residents of Maine.

7. Venue in this district is proper under 28 U.S.C. § 1391(b) because the
   Defendants are residents of the district, and the events giving rise to the
   claim occurred within the district.

8. This case is properly filed in Portland because, to the best of the Plaintiff's
   recollection and belief, the Plaintiff was subject to unlawful action in
   Androscoggin County.

## III.  Statement of Facts

9. On or about December 1 2013, Plaintiff was returning to his former
   residence in Ellington, Connecticut after visiting his family in
   Newburgh, Maine for Thanksgiving when he was pulled over by
   Unknown Maine State Police ("MSP") Officer #1 ("Officer #1") on I-295
   approximately 10 miles south of the Gardiner, Maine tollbooth.

10. Plaintiff was rightfully fearful and unnerved as he was, to the best of
    his knowledge, maintaining the speed limit and being pulled over for no
    apparent reason by law enforcement is never a good situation in the
    Plaintiff's experience.

11. Plaintiff has been diagnosed with Post Traumatic Stress Disorder
    ("PTSD") in approximately 2007 for which he takes prescription anti-
    anxiety medication daily and is therefore perhaps more fearful than
    most in certain situations, such as the one described herein.

12. Officer #1 asked the Plaintiff if he had any Marijuana in his vehicle and

- 2 -

the Plaintiff rightfully responded "No" as he did not.

13. Plaintiff found this question strange as he had not smoked or possessed any marijuana whatsoever for over 3 years, and no Officer had ever asked him this question during a traffic stop.

14. Officer #1 then asked the Plaintiff if he had "maybe just a little joint" in his vehicle and the Plaintiff again rightfully responded "No" as he had no illegal substances whatsoever in his vehicle.

15. Plaintiff found this question in (14) unnecessary and offensive as he had already answered this same question previously in (12) and now Officer #1 appeared to be implying Plaintiff was a liar.

16. Officer #1 then informed the Plaintiff that a K-9 Unit would be arriving shortly in order to inspect his vehicle.

17. Plaintiff does not recall Officer #1 stating that he had a reasonable suspicion that the Plaintiff had marijuana in his car.

18. Furthermore, Plaintiff does not recall Officer #1 radioing or otherwise contacting a K-9 unit.

19. Plaintiff found this situation distressing and concerning as he was positive there were no illegal substances of any kind in his car yet he was being detained for a K-9 search.

20. Approximately one minute later, Unknown Maine State Police Officer #2 ("Officer #2") arrived with a K-9 (dog). Plaintiff recalls Officer #2's response time to be suspiciously fast.

21. Officer #1 told the Plaintiff that Officer #2 and his K-9 would circle the Plaintiff's vehicle as the K-9 sniffed for marijuana, and told the Plaintiff to keep his hands in plain sight at all times. Plaintiff complied with all requests.

22. Officer #2 and the K-9 circled the Plaintiff's vehicle approximately 6 – 8 times and the K-9 failed to respond to the Plaintiff's vehicle in any way whatsoever and appeared to be merely a happy, uninterested dog.

23. Plaintiff's fear grew into a mild panic attack as he watched this situation unfold around him. Just how many times does a K-9 need to circle a vehicle and fail to detect anything before it is deemed there are no drugs in the car? Plaintiff was wondering this to himself as Officer #1 and the K-9 continually circled the Plaintiff's vehicle (22).

24. Officer #2 then put on an unknown, tight-fitting black glove directly in plain sight of the Plaintiff though his passenger-side window, and proceeded to grasp the handle of the Plaintiff's passenger-side door with his gloved hand, making a fist around the door handle, and proceeded to rub his closed-fisted gloved hand around the handle of the Plaintiff's passenger-side door for approximately 3 – 5 seconds.

25. Plaintiff's mild panic attack at that time became a full-blown, major panic attack as this action (24) was highly suspicious and appeared to be "evidence planting" and was being conducted within plain view of the Plaintiff.

26. Officer #2 then suspiciously and purposefully brought his K-9's attention to the door handle by grasping the K-9's leash extremely close to its collar (perhaps the collar itself) and literally forcing the K-9's nose upon the handle.

27. Plaintiff's reasonable suspicion in (25) that Officer #2 was engaging in "evidence planting" or some type of similar nefarious activity appeared to be confirmed in (26) when he literally shoved the snout of his K-9 into the Plaintiff's passenger-side door handle.

28. At that point Officer #1 told the Plaintiff that the K-9 had detected Marijuana in the vehicle and ordered the Plaintiff out of his vehicle.

29. Plaintiff made it clear to Officer #1 that he would not leave his vehicle and allow a search unless explicitly ordered to as the Plaintiff did not want this search to be somehow misconstrued as voluntary or otherwise occurring with the Plaintiff's consent.

30. Officer #1 then told the Plaintiff that it was an order and not a voluntary search and the Plaintiff therefore complied with Officer #1's request in (28).

31. Officer #1 immediately searched the Plaintiff upon his exiting his vehicle, and found his prescription medication, described in (11), which Officer #1 opened and checked.

32. Plaintiff also had a utility knife on his person which Officer #1 checked.

33. There was some cloudy and opaque discoloration on the blade of the Plaintiff's utility knife and Officer #1 asked the Plaintiff if it was blood.

34. Plaintiff responded truthfully and appropriately in the negative.

- 4 -

35. Plaintiff found this question suspicious as the discoloration on the blade of his utility knife looked nothing like blood or dried blood; it was a milky-white color.

36. Officer #1 then placed the utility knife on the dashboard of the Plaintiff's vehicle.

37. The Plaintiff was then instructed by Officer #1 to stand approximately 20-feet in front of his car while his vehicle was searched. Plaintiff complied.

38. Both Officers #1 and #2 then commenced searching the Plaintiff's car. All the Plaintiff's car doors were opened simultaneously, and the Officers began searching the vehicle manually.

39. The Plaintiff then began video-recording the search using his Smart Phone as the situation was obviously highly suspicious as the Plaintiff had witnessed the suspicious activity as detailed in (24 – 28) and was rightfully fearful of the intent and motive(s) and outcome of this search and wanted his own objective evidence of what was going to occur during and after this search.

40. Officer #1 noticed the Plaintiff video-recording the search rather quickly and immediately ducked behind the Plaintiff's open passenger-side door and held a brief conversation with Officer #2 that was inaudible to the Plaintiff.

41. Less than a minute after beginning to video-record the search and the conversation described in (40), Officer #1 walked out to where the Plaintiff was standing, suspiciously dangling a plastic-wrapped piece of pizza and paper plate vertically by the corner edge of the pizza, pinching the corner between his thumb and pointer finger, in the same manner that Police Officers are seen dangling illicit handguns on TV, in the movies, and in the manner ubiquitous in popular culture.

42. Officer #1 was not holding the plate and piece of pizza horizontally between his thumb and hand as anyone else with a plated piece of pizza would.

43. Officer #1 then addressed the Plaintiff in a highly-nervous manner that appeared to be addressed more to the camera than to the Plaintiff, saying things like "Well, we here in Maine often conduct random drug searches, and sometimes despite our best efforts we get it wrong, etc...."

44. The Plaintiff was then told by Officer #1 that the K-9 had "hit" on the piece of pizza, which seemed highly implausible and unbelievable to the

Plaintiff.

45. Officer #1 offered the excuse that "maybe it's because the pizza is old and moldy".  The Plaintiff believes this excuse to have been fraudulent.

46. The Plaintiff is aware that penicillin, derived from mold, is not a narcotic, nor is it Marijuana in-particular, the stated reason for the search, and a trained law-enforcement K-9 should not be "hitting" on a piece of pizza, despite how old or moldy it is.

47. Officer #1 offered to take the moldy piece of pizza with him and out of the Plaintiff's possession for the purposes of "training K-9 units".

48. The Plaintiff did not object to Officer #1's offer in (47) as he was justifiably terrified by that point in time and having a massive panic attack that took most of his thoughts and efforts to control.

49. Plaintiff was then allowed to return to his vehicle and proceed on his way by Officer #1 and was given no ticket, warning, or other evidence of the highly suspicious encounter.  Plaintiff finds this suspicious.

50. Plaintiff therefore states, due to the Facts contained in paragraphs (9) – (49), that Officers #1 and #2 have knowingly conducted an Unconstitutional Search of the Plaintiff's Vehicle and an Unconstitutional Seizure of the Plaintiff's person, a violation of his Fourth Amendment Civil Rights as well as his Article 1 Section 5 Maine State Constitutional Rights.

51. Plaintiff has a reasonable and compelling belief that additional Facts and Evidence will be obtained through the formal Discovery process, notably the Officers' MSP Vehicles' dash camera videos and body camera videos, that will prove beyond a reasonable doubt, not just a preponderance of the evidence, that this search was clearly Unconstitutional.

52. Plaintiff has shown the video he has taken of the search and Officer #1's response to it as detailed in (39) – (49) to his father approximately three weeks later and his father was visibly angry and disgusted with what he saw on that video.

53. Plaintiff found Officer #1's handling of the "offending piece of pizza" like a handgun (41 – 42) to be highly suspicious and perhaps a bit more than coincidental as the Plaintiff had been extensively target practicing with his handgun(s) over the last few days, including that very morning, at his parent's property in Newburgh, Maine.  All of the Plaintiff's handgun(s) were at that time properly disabled and rendered inoperable and secured

in the Plaintiff's trunk for inter-state travel in accordance with all states' laws.

54. Plaintiff has a reasonable suspicion that after finding no drugs in his vehicle the search would have continued to his trunk had he not begun filming this illegal search with his cellphone. The "moldy piece of pizza" excuse offered by Officer #1 (46 – 47) is highly implausible and undeniably unbelievable.

55. Plaintiff will submit the aforementioned video as evidence during the Formal Discovery Process of this action. Plaintiff understands that this complaint is "Public Record" and as such is viewable by the Public. The events captured by video on the Plaintiff's cellphone are incriminating and in all probability highly-embarrassing to those officers involved and the Plaintiff will therefore wait for their formal response before entering this video into evidence. Should The Honorable Court want or need this video earlier the Plaintiff will submit it upon request.

56. Plaintiff has made The Office of Senator Susan Collins, The Office of Governor LePage, The Maine Human Rights Commission, and The Maine Government Oversight Committee aware of the events detailed in (9) – (49) on August 2 2017, and has asked those offices for assistance with this matter, yet has received no reply whatsoever from any of those offices. The document submitted to those offices asking for assistance has been included in this Complaint as "Exhibit A". This specific complaint appears as item #32 on pages 21 – 22 of Exhibit A.

57. The document submitted to all agencies cited above in (56) was identical except for the cover page, which did not differ substantially and can and will be supplied at The Honorable Court's request.

58. The Plaintiff has again made the Agencies cited in (56) aware of this situation, this time in a properly notarized and punishable per perjury affidavit, on October 16 2018, and has again asked for their assistance with this matter, and has again received no reply from them whatsoever. The document submitted to those offices is identical to Exhibit A, bearing sworn oath and notary, and has been included in this Complaint as "Exhibit B".

59. The document submitted to all agencies cited above in (58) was identical except for the cover page, which did not differ substantially and can and will be supplied at The Honorable Court's request.

60. The Plaintiff has followed up with the above-named agencies regarding the notarized submission of his document as described in (58) on

November 19 2018 and has likewise received no reply whatsoever.
Plaintiff has included this unanswered follow-up request as "Exhibit C".

61. The Plaintiff has, on October 11 2017 and July 09 2019, personally visited
The FBI's Regional Field Headquarters in Chelsea, Massachusetts to
discuss the fact that his Constitutional Rights were, are, and continue to
be violated. Although this incident was not discussed specifically, the
Plaintiff has left copy of Exhibit A with the FBI.

62. At no time did the Plaintiff receive any response whatsoever from the FBI
regarding those meetings or his submitted documentation.

63. At all times relevant to this Complaint, to the best of the Plaintiff's
knowledge, the individual Defendants were employed by the Maine State
Government and acting under color of Law. Plaintiff sues these
Defendants in their individual capacity.

64. Plaintiff is highly upset, distraught, and traumatized as a result of this
apparent set-up and Unconstitutional Search.

65. Plaintiff knows he has already been illegally searched once by the MSP
and has no doubt it could happen again at any time, and by any Law
Enforcement Agency under color of Law.

66. Plaintiff is rightfully nervous and distrustful of Law Enforcement and his
State and Federal Government as they have all been made aware of the
deliberate deprivation of his Civil Rights yet not a single Government or
Law Enforcement Entity, much less a single person, has stepped forward
to help him.

67. Plaintiff is rightfully distrustful of Law Enforcement and Government in
general and feels that he can no longer interact well with Law
Enforcement Agencies or The Government as they have either violated or
apparently condoned the violation of his United States and Maine State
Constitutional Rights in an egregious fashion.

68. The fact that the Plaintiff has been so egregiously injured by both Law
Enforcement and The Government has put him in a position where he is
highly uncomfortable in dealing with either of them, and this fact will
only continue to harm the Plaintiff in the future, as such interactions are
sometimes necessary, and the Plaintiff believes proof of this Fact has
already occurred since this incident.

69. This incident has had a dramatic and traumatic chilling effect on the
Plaintiff's Second Amendment Rights. The Plaintiff was once an avid
hunter and pistol "competitor", and quite a good one at that (routinely and

consistently scoring in the high 90's, top possible score is 100) and once had dreams and aspirations of becoming involved in competitive and professional pistol competitions sponsored by such agencies as the NRA. Once, while being observed at the Shooting Range by an NRA enthusiast, the Plaintiff shot a '99' in his presence, which is 9 bullseyes with the tenth shot placed in the ring surrounding the bullseye. Plaintiff was informed by this NRA observer that his score would have been good enough to place him on The United States Olympic Pistol Team if shot during the right match competition. The Plaintiff was so proud of himself that he took this '99ed' target home and gave it to his Father, whom he believes still has it in his possession. Furthermore, the Plaintiff once had dreams and aspirations of honing his skills as a serious hunter as the art of effectively hunting and tracking wild game successfully requires a high degree of skill and is not easy to master. As a result of this apparent set-up and Unconstitutional Search, the Plaintiff fears to possess a firearm of any sort as another set-up of this nature could place him in a position of facing very serious criminal charges, regardless of how fraudulently concocted they might be. Thus, the Plaintiff's dreams and aspirations have necessarily fallen by the wayside and have been crushed out of justifiable fear for his personal safety and future as a result of this apparent set-up and Unconstitutional Search.

70.   Plaintiff wishes to preempt a *Neitzke*-like challenge to this complaint by reminding The Honorable Court that The United States Supreme Court has held that "a court may dismiss a claim as factually frivolous only if the facts alleged are "clearly baseless"". *Neitzke v. Williams*, 490 U.S. 319, 324 (1989). The Facts alleged in this complaint are clearly not baseless as the Fact that the Plaintiff was pulled over by the MSP and searched on or about December 1 2013 is indisputable and Police Records, The Plaintiff's Cell Phone Video Footage, and MSP Vehicle and Body Camera Footage will support all of the major Facts of this complaint ("evidence planting" on the door handle, K-9's nose pressed into the door handle, Officer #1 holding the pizza suspiciously like a handgun, highly unbelievable explanation that a trained law enforcement K-9 misidentified an old piece of pizza as marijuana, etc.).

71   Furthermore, the Plaintiff has a reasonable belief that The Honorable Court is already aware of this MSP stop and search. The Plaintiff has filed his complaint and maintained in (8) that the events took place in Androscoggin County, to the best of his recollection, as the stop was very close to the county line and the Plaintiff believes he had crossed into Androscoggin County from Kennebec County prior to being pulled over. That should make the prefix to this complaint a "2". However, The Honorable Court has assigned this case number 1:19-cv-0486-JAW; the prefix "1" indicating that the events took place in Kennebec County (presumably; Androscoggin County should be a "2").

72. Plaintiff wishes to preempt a *Denton*-like challenge to this complaint by recognizing that this complaint is perhaps not ordinary in the sense that some of the Facts are rather grievous, heinous, and perhaps unusual. After all, who wants to believe that in the United States of America, the people's Constitutional Rights, which are by definition inalienable and inviolable, can be so easily and blatantly violated as in the manner described in this complaint. This is The United States of America, not some dictatorship, and Law Enforcement exists for the protection of the population, and surely that kind of thing can't happen here, right? Well that is unfortunately wrong; it does happen to citizens of the United States of America and it has happened to the Plaintiff as described in this complaint.

73. The United States Supreme Court has held that "An in forma pauperis complaint may not be dismissed, however, simply because the court finds the plaintiff's allegations unlikely" and continues to elaborate and finally concludes by quoting the great poet George Gordon Lord Byron; "Some improbable allegations might properly be disposed of on summary judgment, but to dismiss them as frivolous without any factual development is to disregard the age old insight that many allegations might be "strange, but true; for truth is always strange. Stranger than fiction."" *Denton v. Hernandez*, 504 U.S. 25, 33 (1992). Perhaps this complaint is not so unordinary or "strange" after all as 42 U.S.C. § 1983 and 5 M.R.S. § 4682 exist to "remedy" (if such a thing is even possible) the Constitutional Violations visited upon United States Citizens, such as the Plaintiff, by people acting under the color of law.

## IV. Claims for Relief

### Count 1

42 U.S.C. § 1983 – Deprivation of United States Constitutional Rights.
Unlawful Search of Vehicle and Seizure of Person.

Glen Plourde v. All Defendants

74. Paragraphs (9) – (73) are incorporated by reference as if pled herein.

75. Plaintiff alleges that all Defendants have deprived him of his Fourth Amendment Rights, as applied to the States by the Fourteenth Amendment, and as such are liable to the Plaintiff for damages under 42 U.S.C. § 1983 as well as punitive damages to deter such deprivation of United States Constitutional Rights from occurring to the Plaintiff or to any other citizen again.

76. Unknown Maine State Police Officer #1 has engaged in the deprivation of the Plaintiff's United States Constitutional Rights and is therefore liable to the Plaintiff for damages including punitive damages to deter such deprivation of United States Constitutional Rights from occurring to the Plaintiff or to any other citizen again.

77. Unknown Maine State Police Officer #2 has engaged in the deprivation of the Plaintiff's United States Constitutional Rights and is therefore liable to the Plaintiff for damages including punitive damages to deter such deprivation of United States Constitutional Rights from occurring to the Plaintiff or to any other citizen again.

## Count 2

5 M.R.S. § 4682 – Intentional Deprivation of United States Constitutional Rights, Unlawful Search of Vehicle and Seizure of Person.

Glen Plourde v. All Defendants

78. The Paragraphs (9) – (73) are incorporated by reference as if pled herein.

79. Plaintiff alleges that all Defendants have intentionally deprived him of his Fourth Amendment Rights, as applied to the States by the Fourteenth Amendment, and as such are liable to the Plaintiff for damages 42 U.S.C. § 1983, 5 M.R.S § 4682 and Article 1 Section 19 of The Maine State Constitution as well as punitive damages to deter such intentional deprivation of United States Constitutional Rights from occurring to the Plaintiff or to any other citizen again.

80. Unknown Maine State Police Officer #1 has engaged in the intentional deprivation of the Plaintiff's United States Constitutional Rights and is therefore liable to the Plaintiff for damages including punitive damages to deter such intentional deprivation of United States Constitutional Rights from occurring to the Plaintiff or to any other citizen again.

81. Unknown Maine State Police Officer #2 has engaged in the intentional deprivation of the Plaintiff's United States Constitutional Rights and is therefore liable to the Plaintiff for damages including punitive damages to deter such intentional deprivation of United States Constitutional Rights from occurring to the Plaintiff or to any other citizen again.

## Count 3

5 M.R.S. § 4682 – Intentional Deprivation of Maine State Constitutional Rights, Unlawful Search of Vehicle and Seizure of Person.

Glen Plourde v. All Defendants.

82. The Paragraphs (9) – (73) are incorporated by reference as if pled herein.

83. Plaintiff alleges that all Defendants have intentionally deprived him of his Article 1 Section 5 Maine State Constitutional Rights, and as such are liable to the Plaintiff for damages 5 M.R.S § 4682 and Article 1 Section 19 of The Maine State Constitution as well as punitive damages to deter such intentional deprivation of United States Constitutional Rights from occurring to the Plaintiff or to any other citizen again.

84. Unknown Maine State Police Officer #1 has engaged in the intentional deprivation of the Plaintiff's United States Constitutional Rights and is therefore liable to the Plaintiff for damages including punitive damages to deter such intentional deprivation of United States Constitutional Rights from occurring to the Plaintiff or to any other citizen again.

85. Unknown Maine State Police Officer #2 has engaged in the intentional deprivation of the Plaintiff's United States Constitutional Rights and is therefore liable to the Plaintiff for damages including punitive damages to deter such intentional deprivation of United States Constitutional Rights from occurring to the Plaintiff or to any other citizen again.

## V. Certification and Closing

Under Federal Rule of Civil Procedure 11, by signing below, I certify to the best of my knowledge, information, and belief that this complaint: (1) is not being presented for an improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation; (2) is supported by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law; (3) the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery; and (4) the complaint otherwise complies with the requirements of Rule 11.

I agree to provide the Clerk's Office with any changes to my address where case related papers may be served. I understand that my failure to keep a current address on file with the Clerk's Office may result in the dismissal of my case.

Date of signing:       01/24/2020

Jan 24 2020

Signature of Plaintiff

Glen Plourde

19

Printed Name of Plaintiff

_Glen Plourde_